**ALMEIDA LAW GROUP LLC**
Victor J. Sandoval (SBN 344461)
3415 S. Sepulveda Blvd Suite 1121
Los Angeles, California 90034
(562) 534-5907
victor@almeidalawgroup.com

David S. Almeida (*pro hac vice* forthcoming)
849 W. Webster Avenue
Chicago, Illinois 60614
(708) 437-6476
david@almeidalawgroup.com

*Counsel for Plaintiffs & the Proposed Classes*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

DAVID HSU AND ISHWINDER SINGH *individually and on behalf of all others similarly situated*,

Plaintiffs,

vs.

FANTASIA TRADING LLC,

Defendant.

Case No.

**CLASS ACTION COMPLAINT**

1. VIOLATION OF THE ELECTRONIC COMMUNICATION PRIVACY ACT, 18 U.S.C. § 2510, *et seq.*
2. VIOLATIONS OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 631
3. VIOLATION OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 632
4. VIOLATIONS OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 638.51
5. UNJUST ENRICHMENT
6. INVASION OF PRIVACY
7. INTRUSION UPON SECLUSION
8. COMPREHENSIVE COMPUTER DATA AND ACCESS AND FRAUD ACT, CAL. PENAL CODE § 502, *et seq.*
9. VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, *et seq.*
10. VIOLATION OF CALIFORNIA LEGAL REMEDIES ACT, CAL. CIV. CODE §1770, *et seq.*

**DEMAND FOR JURY TRIAL**

-1-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs David Hsu ("Hsu") and Ishwinder Singh ("Singh" together with Hsu, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action lawsuit against Fantasia Trading LLC ("Fantasia" or "Defendant") and allege, upon personal knowledge as to their own actions and their counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## **INTRODUCTION**

1.     In April 2025, the U.S. Department of Justice implemented the Data Security Program, a national security program codified at 28 C.F.R. Part 202, known as "Bulk Data Transfer Rule," and more formally known as the "Rule Preventing Access to U.S. Sensitive Personal Data and Government-Related Data by Countries of Concern or Covered Persons" (the "BSDR" or the "DOJ Rule").

2.     The impetus for the BSDR was that the U.S. government determined that the export of Americans' behavioral data to hostile foreign regimes or entities under their jurisdiction constitutes an "unusual and extraordinary threat . . . to the national security and foreign policy of the United States that has been repeatedly recognized across political parties and by all three branches of government." [1]

3.     The BSDR was thus implemented to prevent adversarial countries from acquiring large quantities of behavioral data which could be used to surveil, analyze, or exploit American citizens' behavior.

4.     To prevent any potential for mass surveillance, the BSDR prohibits transferring Americans' bulk sensitive personal data to entities tied to "countries of concern."

5.     Currently, the "countries of concern" are China, Cuba, Iran, North Korea, Russia, and Venezuela. The Rule also limits access by "covered persons," meaning (i) individuals who either reside in "countries of concern" or are controlled by entities in those countries or (ii) entities

---

[1] Justice Department Implements Critical National Security Program to Protect Americans' Sensitive Data from Foreign Adversaries, U.S. DOJ (Apr. 11, 2025), *available at* https://www.justice.gov/opa/pr/justice-department-implements-critical-national-security-programprotect-americans-sensitive (last visited January 29, 2026; internal quotation omitted).

that are organized or chartered under the laws of, or have their principal place of business in, a country of concern, or are owned 50% or more by such entities.

6. The bulk sensitive data addressed includes the personal identifiers and associated communications at issue in this case.

7. The BSDR makes clear that sending American consumers' information to Chinese entities through automated advertising systems and associated databases is prohibited, as evidenced by examples provided by DOJ in the BSDR. [2]

8. Fantasia, and its Chinese parent, Anker Innovations Technology Co., Ltd. ("Anker"), have repeatedly faced scrutiny from state regulators and members of Congress over concerns that their data practices facilitate surveillance by the Chinese government. These regulators have warned that Anker functions as a conduit for state directed data collection targeting American residents.

9. In direct violation of the BSDR, Fantasia—through its automated advertising infrastructure and associated databases—transmits Plaintiffs' and potentially millions of other American consumers' data to China.

10. This putative class action lawsuit results from that unlawful data-sharing of American citizens' sensitive information with a foreign adversary of the United States in direct violation of the BSDR.

11. As detailed herein, Fantasia knowingly and systematically used communications and associated covered personal identifiers intercepted from American citizens for the purpose of sharing U.S. consumers' data with covered persons without the safeguards required by U.S. law.

12. When plaintiff David Hsu ("Hsu") visited https://www.ankersolix.com to browse for products and, ultimately, to purchase portable solar panels, Defendant facilitated the interception and disclosure of the full-page context—including full-string URLs revealing the pages viewed and product viewed—and persistent identifiers—including IP addresses, advertising IDs, and cookie data—to third parties.

13. Similarly, when plaintiff Ishwinder Singh ("Singh") visited https://www.anker.com/

---

[2] *See, e.g.,* 28 C.F.R. §§ 202.214(b)(7); 202.228(c)(2).

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

(with https://www.ankersolix.com, https://www.soundcore.com/, https://www.eufy.com/, https://www.eufymake.com/, collectively and/or individually, the "Website(s)") to browse for products and, ultimately, to purchase an Anker Prime Charger, Defendant facilitated the interception and disclosure of the full-page context—including full-string URLs revealing the pages viewed and product viewed—and persistent identifiers—including IP addresses, advertising IDs, and cookie data—to third parties.

14. Fantasia then used the intercepted communications and identifiers for its own purposes including transmitting the intercepted communications and identifiers to covered persons—which includes entities, like Anker, organized or chartered under the laws of, or having their principal place of business in, a country of concern, like China—in violation of the BSDR.

15. This transmission enabled Fantasia, its foreign parents, and China, to link Plaintiffs' browsing activity to their identity, track their behavior, and build detailed profiles reflecting their interests, location, habits and other private attributes.

16. In the hands of a foreign adversary, such data can be used to assemble detailed behavioral profiles, identify psychological or financial weaknesses, and monitor individuals in sensitive roles including, but not limited to, jurists, military personnel, journalists, politicians, or dissidents.

17. The disclosure of such data to anyone is a profound invasion of privacy but when that data is disclosed to foreign adversaries, it is also a direct threat to national security as it greatly increases the potential for coercion, reputational harm, and/or blackmail.

18. The conduct alleged herein gives rise to numerous individual and representative claims under federal and state law including, but not limited to, the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* ("ECPA"), because Fantasia used consumers' intercepted communications with the intention and for the purpose of disclosing that data in furtherance of a criminal or tortious act; specifically, the unlawful transfer of consumers' bulk sensitive personal data to a prohibited foreign entity in violation of the BSDR.

**PARTIES**

19. Hsu is and was at all relevant times, an individual and resident of the City of San

-4-

Francisco in San Francisco County, California. Hsu intends to remain in California indefinitely and makes his permanent home there.

20. Singh is and was at all relevant times, an individual and resident of the City of Los Angeles in Los Angeles County, California. Singh intends to remain in California indefinitely and makes his permanent home there.

21. Fantasia is a Delaware corporation with its principal place of business located at 5350 Ontario Mills Parkway, Ontario, California. Fantasia is Anker's wholly owned U.S. operating subsidiary. Fantasia's activities are under the control and direction of its parent Anker.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this putative class action lawsuit pursuant to 28 U.S.C. § 1331 because Plaintiffs assert an individual and representative claim under the ECPA, a federal statute.

23. The exercise of federal subject matter jurisdiction is also appropriate  pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"), because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) there are more than 100 members of the Class, (iii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iv) none of the exceptions apply to this action.

24. This Court has personal jurisdiction over Fantasia because it conducts business in this judicial district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the judicial district.

25. Venue is proper pursuant to 28 U.S.C. § 1391(b) because plaintiff Hsu resides in this judicial district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here.

## DIVISIONAL ASSIGNMENT

26. Pursuant to Local Rules 3.2(c) and 3.5(b), assignment to the San Francisco Division is proper because a substantial part of the events giving rise to Hsu's claims occurred in San Francisco County, and plaintiff Hsu resides in San Francisco County.

//

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

## FACTUAL ALLEGATIONS

**A.     FANTASIA AND ANKER**

27.     Fantasia is the U.S.-based operating subsidiary of Anker, a Chinese electronics manufacturer that focuses on smart devices used for entertainment, travel, and smart homes, and is centered around five key brands: Anker Solix, Anker, Soundcore, eufy, and Nebula.

28.     Anker is a Chinese corporation that is headquartered, and maintains a principal place of business, in Changsha, Hunan, China and that is listed on the Shenzhen Stock Exchange.[3]

29.   Because Anker is headquartered and operates in China, it is subject to Chinese law, including legal regimes that can impose obligations to support, assist, and cooperate with intelligence and security authorities and to maintain secrecy regarding such cooperation, such as China's National Intelligence Law, Cybersecurity Law, and Data Security Law.

30.     These laws require Chinese companies and individuals to secretly cooperate with government surveillance efforts and to grant authorities unrestricted access to private user data.

31.     Anker's operations are subject to Chinese government control, oversight, and compelled disclosure obligations.

32.     These legal obligations require companies headquartered and operating in China—including Anker—to be subject to compelled assistance, compelled disclosure, secrecy constraints that limit transparency regarding Chinese government access to data.

**B.     THE BULK SENSITIVE DATA TRANSFER RULE**

33.     The BSDR restricts or prohibits U.S. persons from engaging in covered data transactions with covered persons.

34.     A U.S. person includes, *inter alia*, "any entity organized solely under the laws of the United States or any jurisdiction within the United States (including foreign branches)[.]" 28 C.F.R. § 202.256.

35.     A "covered person" includes, *inter alia*, "a foreign person … that is organized or

---

[3] Our Story *available at* https://en.anker-in.com/story?, archived at https://perma.cc/47WJ-AN62; Anker Innovations Technology Co Ltd (300866) Profile *available at* https://www.investing.com/equities/anker-innovations-technology-co-ltd?, archived at https://perma.cc/3TVJ-7WBT

chartered under the laws of, or has its principal place of business in, a country of concern[.]" *Id.* § 202.211.

36.    A "country of concern" includes, *inter alia*, "China," which means "the People's Republic of China, including the Special Administrative Region of Hong Kong and the Special Administrative Region of Macau, as well as any political subdivision, agency, or instrumentality thereof." *Id.* §§ 202.208, 202.601

37.    A "covered data transaction" is "any transaction that involves any access by a country of concern or covered person to any government-related data or bulk U.S. sensitive personal data and that involves: (1) Data brokerage; (2) A vendor agreement; (3) An employment agreement; or (4) An investment agreement." *Id.* § 202.210.

38.    "Bulk U.S. sensitive personal data" means "a collection or set of sensitive personal data relating to U.S. persons, in any format, regardless of whether the data is anonymized, pseudonymized, de-identified, or encrypted, where such data meets or exceeds the applicable threshold set forth in § 202.205." *Id.* § 202.206

39.    Section 202.205 sets forth the applicable thresholds for being considered "bulk" data. "Bulk" means "any amount of sensitive personal data that meets or exceeds the [listed] thresholds at any point in the preceding 12 months, whether through a single covered data transaction or aggregated across covered data transactions involving the same U.S. person and the same foreign person or covered person[.]" *Id.* § 202.205.

40.    The applicable threshold for "covered personal identifiers" is that "collected about or maintained on more than 100,000 U.S. persons[.]" *Id.*

41.    The term "covered personal identifiers" means "any listed identifier: (1) In combination with any other listed identifier; or (2) In combination with other data that is disclosed by a transacting party pursuant to the transaction such that the listed identifier is linked or linkable to other listed identifiers or to other sensitive personal data." *Id.* § 202.212.

42.    The term "listed identifier" means "any piece of data in any of the following data fields: (a) Full or truncated government identification or account number (such as a Social Security number, driver's license or State identification number, passport number, or Alien Registration

Number); (b) Full financial account numbers or personal identification numbers associated with a financial institution or financial-services company; (c) Device-based or hardware-based identifier (such as International Mobile Equipment Identity ('IMEI'), Media Access Control ('MAC') address, or Subscriber Identity Module ('SIM') card number); (d) Demographic or contact data (such as first and last name, birth date, birthplace, ZIP code, residential street or postal address, phone number, email address, or similar public account identifiers); (e) Advertising identifier (such as Google Advertising ID, Apple ID for Advertisers, or other mobile advertising ID ('MAID')); (f) Account-authentication data (such as account username, account password, or an answer to security questions); (g) Network-based identifier (such as Internet Protocol ('IP') address or cookie data); or (h) Call-detail data (such as Customer Proprietary Network Information ('CPNI'))." *Id.* § 202.234.

43. The effective date of the BSDR was April 8, 2025. *Id.* § 202.216

44. Under the BSDR, "no U.S. person, on or after the effective date, may knowingly engage in a covered data transaction involving data brokerage with a country of concern or covered person." *Id.* § 202.301 (a "Prohibited Data Transaction").

45. A "data brokerage" means "the sale of data, licensing of access to data, or similar commercial transactions, excluding an employment agreement, investment agreement, or a vendor agreement, involving the transfer of data from any person (the provider) to any other person (the recipient), where the recipient did not collect or process the data directly from the individuals linked or linkable to the collected or processed data." *Id.* § 202.214

46. Similarly under the BSDR, "no U.S. person, on or after the effective date, may knowingly engage in a covered data transaction involving a vendor agreement, employment agreement, or investment agreement with a country of concern or covered person unless the U.S. person complies with the security requirements (as defined by § 202.248) required by this subpart D and all other applicable requirements under this part." *Id.* § 202.401 (a "Restricted Data Transaction").

47. An "investment agreement" means "an agreement or arrangement in which any person, in exchange for payment or other consideration, obtains direct or indirect ownership

-8-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

interests in or rights in relation to: (1) Real estate located in the United States or (2) A U.S. legal entity." *Id.* § 202.228.

48.    The "security requirements" defined by section 202.248 means "the Cybersecurity and Infrastructure Agency ('CISA') Security Requirements for Restricted Transactions E.O. 14117 Implementation, January 2025." *Id.* § 202.248.

49.    The CISA Security Requirements for Restricted Transactions E.O. 14117 Implementation, January 2025, require certain organizational- and system-level requirements—including, *inter alia*, implementing certain organizational cybersecurity policies, practices, and requirements; implementing logical and physical access controls to prevent covered persons or countries of concern from gaining access to covered data that that does not comply with the data-level requirements; implementing risk assessment and mitigation strategies outlining how implementation will prevent access to covered data that is linkable, identifiable, unencrypted, or decryptable using commonly available technology by covered persons and/or countries of concern—and certain data-level requirements—including, *inter alia*, applying data minimization and data masking strategies to reduce the need to collect, or sufficiently obfuscate, respectively, covered data to prevent visibility into covered data, and applying encryption techniques to protect covered data during the course of restricted transactions. [4]

50.    As detailed above, Fantasia is a "U.S. person" because it is organized under the laws of Delaware and headquartered in California. Anker is a "covered person" because it is a foreign person whose principal place of business is in China and that is organized under the laws of China.

51.    As detailed above and below, Fantasia engages in Prohibited or Restricted Data Transactions with Anker, without the requisite security requirements, in violation of the BSDR.

C.    **FANTASIA'S WEBSITES USES TRACKERS WHICH EXPOSE AMERICANS' BEHAVIORAL DATA TO FOREIGN ADVERSARIES.**

52.    When a user lands on the homepages of Websites, the Websites load numerous first-

---

[4] *See, e.g.,* Security Requirements For Restricted Transactions Pursuant To Exec. Order 14117, Preventing Access To Americans' Bulk Sensitive Personal Data And United States Government-Related Data By Countries Of Concern *available at* https://www.cisa.gov/sites/default/files/2025-01/Security_Requirements_for_Restricted_Transaction-EO_14117_Implementation508.pdf

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

and third-party tracking implementations that measure and record user data.

53.     These tracking technologies are small pieces of code that Fantasia intentionally integrated into the Websites to track user behavior and to transmit data to first- and third-party platforms.

54.     Fantasia intentionally programmed and deployed on the Websites such tracking technologies, provided by TikTok, Facebook, Microsoft, Google, Criteo, Taboola, Attentive, Applovin, Magnite, LiveIntent, X, Pinterest, Snapchat, the Trade Desk, Reddit, and Outbrain, among numerous others (collectively and/or individually, the "Tracking Technologies"). [5]

55.     Through the Tracking Technologies, Fantasia collects bulk personal data, from users of the Website. This data includes persistent identifiers—including IP addresses, advertising IDs, and cookie data—and the full-page context—including full-string URLs revealing the pages viewed and product viewed.

56.     On information and good faith belief, Fantasia has collected or maintained this sensitive personal data relating to more than 100,000 U.S. persons (including Plaintiffs and the putative class members) following the effective date of the BSDR, and therefore this information constitutes "bulk U.S. sensitive data" under the BSDR.

57.     Indeed, publicly available web traffic reports estimate that more than 100,000 U.S.-based devices visit just one of the Websites each month. [6]

58.     Without appropriate safeguards or excluding covered foreign parents, Fantasia knowingly permits access to, or transfer of, such bulk U.S. sensitive personal data to entities or persons that qualify as covered persons under the BSDR, including its foreign parents and affiliates that are directly or indirectly controlled by persons in China, such as Anker.

59.     Fantasia's actions create undue risks to national security and to the privacy of U.S. persons because providing access to sensitive personal data to covered persons is prohibited or

---

[5] On information and good faith belief, this list is only a portion of the Tracking Technologies that Defendant implemented on the Websites.

[6] Anker.com Monthly Domain Overview, *available at* https://www.spyfu.com/overview/domain?query=anker.com (last visited Feb. 18, 2026).

-10-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

restricted without strict compliance with the statutes and regulations promulgated under Executive Order 14117 and related federal law.

60. Despite the sensitivity of this data, Fantasia did not require users to validly consent to the operation of the Tracking Technologies.

61. As a result, Websites users' personal information, including persistent identifiers (*e.g.,* cookie IDs, device IDs, mobile advertising IDs, and IP addresses), device metadata (*e.g.,* screen resolution, browser version, operating system, and language settings), and contextual information such as full URLs and referring pages are surreptitiously obtained by the Tracking Technologies.

62. Such user data is correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics.

63. Those in possession of this information gain deep understanding of users' behavioral traits and characteristics.

64. By installing and using the Tracking Technologies, Fantasia enabled comprehensive data collection regarding users' communications and personal identifiers covered by the BSDR so that it could then share that information with entities covered under the BSDR, including Anker.

65. This is significant because, in the hands of a foreign adversary, the data intercepted by the Tracking Technologies can be used for far more than just e-commerce.

66. A company like Anker, operating under Chinese jurisdiction, use this data, and assist the Chinese government in using this data, to build detailed dossiers on U.S. residents, identify psychological or financial vulnerabilities, and target individuals in sensitive roles—such as jurists, military personnel, journalists, politicians, or dissidents.

67. This data can be weaponized for profiling, coercive targeting, or even blackmail, all without the user's knowledge that their information is being transmitted to a foreign-controlled entity.

68. Indeed, such vulnerabilities prompted the passage of the BSDR in the first place. [7]

_____

[7] Justice Department Issues Final Rule Addressing Threat Posed by Foreign Adversaries' Access

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

**D.     FANTASIA KNOWINGLY VIOLATES THE BSDR.**

69.     On April 8, 2025, the U.S. Department of Justice issued the BSDR, codified at 28 C.F.R. Part 202, to restrict the transfer of Americans' bulk sensitive personal data to "countries of concern," including China.

70.     Under the BSDR, it is unlawful to transfer "bulk U.S. sensitive personal data"—including the categories of persistent identifiers that Fantasia obtains from the Tracking Entities—to certain entities associated with adversarial foreign governments.

71.     Anker is a recognized national security threat.

72.     For example, in September 2025, the Chairman of Congressional Select Committee on the Chinese Communist Party issued a letter requesting that the U.S. Department of Commerce investigate Anker—a "Chinse Communist Party (CCP)-backed entit[y]" for "gain[ing] unfair access to and dominance within the U.S. market, at the expense of American businesses and national security." The letter noted that "Anker . . . has a documented history of significant security vulnerabilities . . . and has been accused of misleading the public about these issues." And that "Anker poses a risk by potentially embedding foreign surveillance and destructive capabilities into" its products. [8]

73.     Further, Fantasia admits in its Websites' Privacy Policy that it transfers users' personal information to Anker and the People's Republic of China.  In the section, "International Transfer of Personal Data" it discloses that "we transfer Personal Data within Anker group . . . we transfer Personal Data to other countries that may have different laws and data protection

to Americans' Sensitive Personal Data *available at* https://www.justice.gov/archives/opa/pr/justice-department-issues-final-rule-addressing-threat-posed-foreign-adversaries-access (last visited Jan. 27, 2026).

[8] September 19, 2025 Letter From Select Committee on Chinese Communist Party, *available at* https://chinaselectcommittee.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/letter-to-secretary-lutnick_anker_091925.pdf. Anker has also been scrutinized by state regulators for its data practices, including by the New York Attorney General. *See James v. Fantasia Trading LLC et al*, No. 24-103, Assurance of Discontinuance *available at* https://ag.ny.gov/sites/default/files/settlements-agreements/state-of-new-york-v-fantasia-training-llc-aod-2025.pdf

-12-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

compliance requirements than those that apply in the country in which you are located, including China[.]"Further, in the section, "Details of Controllers" it discloses that Fantasia and Anker are "joint Controllers" that "can both access your Personal Data and decide on the means and purposes of the Processing." And, "Personal Data" explicitly includes, among other information, information obtained from cookies (such as cookie IDs) pixels, and similar tracking technologies, browser meta data (such as browser type), unique identifiers associated with a device or a network, persistent device identifiers, advertising IDs, IP addresses, device-based and hardware-based identifiers (such as device serial numbers and device MAC address), and demographic or contact data (such as first and last name, email address, mailing addresses, and phone number). [9]

74.     Further, the Websites' Privacy Policy purports to safeguard personal information transferred to China by maintaining agreements and standard contractual clauses that govern the transfer, processing and protection of personal information. [10]

75.     However, under the BSDR, a U.S. entity that engages in a restricted covered data transaction must do more than maintain agreements and standard contractual clauses—it must ensure the bulk U.S. data is not accessible by countries of concern—by implementing detailed security controls and documentation covering data access protections, segmentation, auditing, and restrictions on onward transfer to covered persons.

76.     This failing is not inadvertent—Anker is aware of the requirements of the BSDR.

77.     For example, in recent securities-related reporting, Anker recognized that it is "subject to federal and state regulations in the United States . . . which impose additional obligations . . . and restrictions on cross-border sharing." Simultaneously, Anker recognized the tension in

---

[9] Anker Group Privacy Policy Effective between October 24, 2025 and January 30, 2026 *available at* https://web.archive.org/web/20260101185114/https://www.ankersolix.com/policies/privacy-policy; *see also* Anker Group Privacy Policy Effective as of January 30, 2026 https://www.ankersolix.com/policies/privacy-policy (materially identical, except that Anker is replaced by Anker Innovations Limited, an entity head quartered in Hong Kong, which also qualifies as a "covered person" under the BSDR).

[10] *Id.*

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

complying with such laws and Chinese laws concerning "the transfer of personal information and important data," noting that:

> ***there may be circumstances where we engage in such cross-border data transfers. In such case, in order to satisfy the legal and regulatory requirements, we may need to comply with the foregoing requirements as well as any other limitations under PRC laws*** then applicable. ***Complying with these laws and requirements could*** cause us to incur substantial expenses or ***require us to alter or change our practices*** in ways that could harm our business. . . . If we cannot meet relevant requirements under the evolving applicable laws or regulations relating to . . . personal information protection . . . we could face damage in our reputation or other negative consequences, such as investigations, fines, or suspension of our business, any of which could materially and adversely affect our business, financial condition and results of operations. In addition, ***complying with various laws and regulations on personal information protection could*** cause us to incur additional costs or ***require us to change our business practices, including our data practices***, which may significantly distract our management's attention and adversely affect our business. [11]

78. Despite the DOJ's clear guidance, and Fantasia's recognition thereof, Fantasia has continued to transmit sensitive user data to China.

79. These transmissions include identifiers covered by the BSDR, browsing behavior, and contextual metadata that enable Fantasia, and its foreign parents, to track, profile, and retain data about U.S. residents.

80. Anker's conduct is not accidental, peripheral, or the result of isolated technical missteps.

81. Rather, Anker knowingly facilitated the export of Americans' behavioral data to a foreign adversary.

82. In doing so, it disregarded binding federal law, the BSDR, created specifically to address what the U.S. government has called an "unusual and extraordinary threat" to the national security and foreign policy of the United States.

**E.      FACTS SPECIFIC TO REPRESENTATIVE PLAINTIFFS.**

83. Hsu is a resident of San Francisco, California.

---

[11] Anker 2025 Risk Factors *available at* https://www1.hkexnews.hk/app/sehk/2025/107925/a127925/sehk25120202958.pdf (last visited February 18, 2026); *see also* https://www1.hkexnews.hk/app/sehk/2025/107925/2025120202912.htm

84.    In and before December of 2025, Hsu visited the Website on multiple occasions.

85.    During these visits to the Website, Hsu navigated multiple product pages utilizing full-string URLs displaying the product viewed and displaying that he was searching for solar panels and related accessories.

86.    Hsu also searched the Website for, *inter alia*, Anker SOLIX F3000 + 400W Portable Solar Panel, which he ultimately purchased.

87.    While Hsu was actively viewing the Website, his browser loaded code implemented by Defendant and operated by the Tracking Technologies.

88.    This code initiated automated requests sent from Hsu's browser to third party servers and triggered the interception of his data.

89.    Those requests featured persistent identifiers uniquely associated with Hsu— including his cookie IDs, device IDs, IP addresses, and browser metadata—along with the full URL of the specific page that Hsu was viewing at the time, which displayed the specific product he was viewing, and displayed that he was searching for solar panels and related accessories.

90.    Singh is a resident of Los Angeles, California.

91.    In and around early November 2025, Singh visited the Website on multiple occasions.

92.    During these visits to the Website, Singh navigated multiple product pages utilizing full-string URLs displaying the product viewed and displaying that he was searching for charging accessories.

93.    Singh also searched the Website for, *inter alia*, Anker Prime Charger, which he ultimately purchased.

94.    While Singh was actively viewing the Website, his browser loaded code implemented by Defendant and operated by the Tracking Technologies.

95.    This code initiated automated requests sent from Singh's browser to third party servers and triggered the interception of his data.

96.    Those requests featured persistent identifiers uniquely associated with Singh— including his cookie IDs, device IDs, IP addresses, and browser metadata—along with the full URL

-15-

of the specific page that Singh was viewing at the time, which displayed the specific product he was viewing, and displayed that he was searching for charging accessories.

97. Defendant then used these intercepted communications for its own purposes, including enriching persistent profiles and databases which were then transferred to, or accessible by, its parent company, Anker, and the People's Republic of China, in direct violation of the BSDR. Indeed, Fantasia admits in the Website's Privacy Policy that Fantasia transfers users' personal information to Anker and the People's Republic of China.

98. As a result, Anker, a covered person under the BSDR, received detailed information about Plaintiffs' online behavior and interests, without his knowledge or consent.

99. Fantasia's covert tracking and sharing of Plaintiffs' sensitive data violates Plaintiffs' reasonable expectations of privacy.

100. This data, particularly when appended to persistent profiles, reveals sensitive details about Plaintiffs. Aggregating and utilizing this information without Plaintiffs' knowledge or consent goes far beyond what any reasonable consumer would expect and constitutes a serious intrusion into private life.

101. Plaintiffs did not consent to the interception, enrichment, or foreign transmission of their browsing data.

102. Fantasia's conduct caused Plaintiffs concrete and particularized harm, including the unauthorized disclosure of personal information to a foreign entity, the invasion of their privacy, and the loss of control over how and where their browsing behavior was used and shared.

<strong><u>CLASS ALLEGATIONS</u></strong>

103. Plaintiffs bring this proposed class action lawsuit pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of themselves and a Nationwide Class (the "Class"), a Nationwide Use Class (the "Use Class" together with the Class, the "Nationwide Classes"), a California class (the "California Class") and a California purchaser Class (the "California Purchaser Class" and together with the Nationwide Classes, and the California Class, the "Classes") of all others similarly situated, defined as follows:

a.    **Nationwide Class**: All individuals in the United States whose electronic communications with the Websites were intercepted.

b.    **Nationwide Use Class**: All individuals in the United States whose electronic communications with the Websites were intercepted and whose communications and personal data—including persistent identifiers and behavioral activity—was used on or after April 8, 2025.

c.    **California Class**: All individuals who resided in the State of California at the time their electronic communications with the Websites were intercepted.

d.    **California Purchaser Class**: All members of the California Class who resided in the State of California and made purchases on the Websites and had electronic communications with the Websites intercepted.

104.    Excluded from the Classes are: (i) any Judge or Magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiffs' counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

105.    **Numerosity**: The exact number of the members of the Classes is unknown and not available to Plaintiffs at this time, but individual joinder is impracticable. On information and belief, Defendant has many thousands of users who fall into the definition of the Classes. Members of the Classes can be identified through Defendant's records.

106.    **Commonality and Predominance**: There are questions of law and fact common to the claims of Plaintiffs and the alleged Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes members include, but are not necessarily limited to the following:

a.    Whether Defendant used tracking technologies to cause users' web browsers to reroute electronic communications—including URLs, metadata, and behavioral activity;

b.    Whether Defendant used a device, as defined under 18 U.S.C. § 2510(5), to

-17-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

intercept the contents of communications from Plaintiffs and the Class;

c.  Whether Defendant obtained valid consent from Plaintiffs and the Classes to aid in the interception and disclosure their electronic communications to third parties, and to use such communications;

d.  Whether the data transmitted by Defendant constitutes "bulk U.S. sensitive personal data" under the BSDR;

e.  Whether Defendant's transmission of data to its Chinese-controlled entities constitutes a prohibited or restricted transaction under the BSDR;

f.  Whether Defendant acted knowingly and with intent to share the information;

g.  Whether Defendant's interception and disclosure of users' communications falls within the crime-tort exception to the ECPA's party-consent provision;

h.  Whether Defendant was unjustly enriched at the expense of the Class;

i.  Whether Defendant's actions violate California laws invoked herein; and

j.  Whether Plaintiffs and members of the Classes are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

107.  **Typicality**: Plaintiffs' claims are typical of the claims of members of the Classes. The claims arise from a common nucleus of operative fact—inter alia, the surreptitious interception and illicit transfer of their personal information to a foreign adversary of the United States. Plaintiffs, like all members of the Classes, had their information unlawfully intercepted and have been injured by Defendant's misconduct at issue.

108.  **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Classes. That is, Plaintiffs and the members of the Classes sustained injuries and damages as a result of Defendant's conduct. Plaintiffs also have no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel have any conflicts with or interests adverse to the Classes.

-18-

109.   **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Classes is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint as well as the risk of inconsistent adjudication. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Through a class action, economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

110.   Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class Definitions" based on facts learned through additional investigation and in discovery.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C §2510, *et seq.***
***(On Behalf of Plaintiffs & the Nationwide Classes)***

111.   Plaintiffs repeat and re-allege all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

112.   Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Classes against Defendant.

113.   The ECPA prohibits any person from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

114.   The ECPA also prohibits any person from "intentionally us[ng], or endeavor[ing] to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(d).

115.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire,

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

oral, or electronic communication is intercepted or used in violation of 18 U.S.C § 2511.

116. Defendant knowingly and intentionally distributes and maintains the Tracking Technologies on the Websites for the purpose of rerouting user communications to the Tracking Technologies' servers, and for Defendant's later use.

117. The Tracking Technologies intentionally capture the contents of users' interactions with the Websites and purposefully transmit them to the Tracking Technologies' servers.

118. The Tracking Technologies' tracking code executed automatically within Plaintiffs' and Nationwide Class members' browsers during the page load process without Plaintiffs' consent.

119. This code intercepted the contents of Plaintiffs' and the members of Nationwide Classes' interactions with the Websites by rerouting their communications—including but not limited IP addresses, identifiers, full URLs, page titles, and the content of the page—to the Tracking Technologies.

120. These interceptions occurred as part of the browser's rendering of the Website, before Plaintiffs or members of the Nationwide Classes could detect the transmissions or consent to the transmissions.

121. When Plaintiffs and the members of the Nationwide Classes navigate the Website, the Tracking Technologies' code causes their browsers to transmit IP addresses, identifiers, full URLs, page titles, related to Plaintiffs and the Nationwide Class members in real time.

122. These transmissions occur without the user's awareness or consent and are initiated automatically during the same browser session in which the user communicates with the Website.

123. The Tracking Technologies' capture of these communications constitutes an unlawful interception under the ECPA. Defendant's subsequent use of these communications constitutes an unlawful use under the ECPA.

124. **Contents of a Communication:** The data intercepted by the Tracking Technologies from Plaintiffs and members of the Nationwide Classes includes full-page URLs and identifiers. These qualify as the "contents" of a communication under 18 U.S.C. § 2510(8) because they reveal the substance and subject matter of the user's communications with the Website.

125. **Use of a Device:** The technologies the Tracking Technologies use to intercept this

data—including but not necessarily limited to web beacons, pixels, software development kits, APIs, JavaScript, real-time bidding and other scripts, and cookies—constitute "devices" under 18 U.S.C. § 2510(5), which includes any device or apparatus used to intercept electronic communications.

126.    **Lack of Consent:** Plaintiffs and members of the Nationwide Classes did not consent to the Tracking Technologies' interception or disclosure of their communications.

127.    The Websites did not provide clear or conspicuous notice that user interactions would be surveilled and routed to foreign entities, and Plaintiffs and members of the Nationwide Classes lacked a reasonable means to opt out of the Tracking Technologies' data collection and sharing. There was no actual or implied consent under applicable law.

128.    **Crime-Tort Exception:** The "party exception" in 18 U.S.C. § 2511(2)(d) does not apply. At the time of the interception, the Tracking Technologies' interception and, and Defendant's use of these communications, was undertaken knowingly and intentionally for the purpose of committing a criminal and tortious act—namely, the unlawful transmission of bulk U.S. sensitive personal data to a covered foreign entity in violation of the Rule, 28 C.F.R. Part 202.

129.    On or after April 8, 2025, Defendant knowingly engaged in prohibited or restricted data transactions with Anker, a foreign-owned entity, organized under the laws of Hong Kong, with its principal place of business in China, without the requisite security requirements, in violation of the Rule. 28 C.F.R. §§ 202.301, 202.401.

130.    Defendant is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in California. Because Defendant is organized under the laws of the United States and is an entity in the United States, Defendant is a "U.S. person" under 28 C.F.R. § 202.256.

131.    Anker, and related affiliates, qualify as a "covered person" under 28 C.F.R. § 202.211(a) because they are a Chinese or Hong Kong companies with substantial operations and executive oversight in the People's Republic of China and/or Hong Kong—a "country of concern" under the Rule.

132.    Anker, and related affiliates,  maintain a significant presence in China and is subject

-21-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

to Chinese law, including China's National Intelligence Law, Cybersecurity Law, and Data Security Law.

133.    These laws compel Chinese companies and individuals to secretly cooperate with government surveillance efforts and grant authorities unrestricted access to private user data.

134.    Anker's operations are subject to Chinese government control, oversight, and compelled disclosure obligations.

135.    The Tracking Technologies initiate requests which result in the transmission of numerous protected "listed identifiers" under the Rule, including but not limited to IP addresses (28 C.F.R. § 202.234(g)), advertising IDs (28 C.F.R. § 202.234(e)), and cookie data (28 C.F.R. § 202.234(g)) to and through the Tracking Technologies' and into Defendant's possession.

136.    Defendant then transmits or provides access to these protected identifiers together, including, for example, transmitting a given user's IP address along with the user's cookie data and advertising IDs, such that the identifiers are clearly linked with one another and are associated or reasonably capable of being associated with each related user to Anker.

137.    This information qualifies as "covered personal identifiers" and "sensitive personal data" under the BSDR because these identifiers are shared with Anker (i) in combination with at least one other listed identifier, or (ii) in combination with other data such that the listed identifier is or can reasonably be associated with other listed identifiers or other sensitive personal data. *See* 28 C.F.R. §§ 202.212(a), 202.249(a).

138.    On information and belief, Fantasia has collected or maintained this sensitive personal data relating to more than 100,000 U.S. persons (including Plaintiffs and Use Class members) following the effective date of the BSDR, and therefore this information constitutes "bulk U.S. sensitive data" under 28 C.F.R. § 202.206.

139.    Defendant provides this data to Anker and affiliated "covered persons." Indeed, Fantasia admits in the Website's Privacy Policy that Fantasia transfers users' personal information to Anker and to the People's Republic of China, without the requisite safeguards and security controls.  Fantasia's provision of this bulk U.S. sensitive data to Anker and affiliated covered persons, constitutes a covered data transaction under 28 C.F.R. §§ 202.210, 202.214, 202.301,

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

202.401.

140. Anker acknowledged in its own regulatory filings that it is at risk of violating U.S. privacy and data transfer regulations.

141. Accordingly, Fantasia knew or reasonably should have known that it had engaged and was engaging in covered data transactions in violation of the BSDR.

142. Because Fantasia knowingly engaged and engages in covered data transactions with Anker, a covered person, Fantasia has violated the BSDR's prohibition of data-brokerage transactions under 28 C.F.R. § 202.301 and/or of engaging in restricted transactions without the requisite security controls under 28 C.F.R. § 202.401.

143. In addition to Fantasia's tortious and criminal intent to violate the BSDR by sharing certain information with entities subject to the jurisdictional control of China, as described further below, the interceptions by the Tracking Technologies were also knowingly and intentionally performed for the independent purpose of committing tortious acts in violation of common law, specifically:

   a. Violating Plaintiffs' and the Class members' right to privacy through the creation and dissemination of highly detailed identity profiles, enriched by the contents of Plaintiffs' and the Class members' communications intercepted by the Tracking Technologies, as described herein; and

   b. Committing the tort of intrusion upon seclusion by using the contents of the intercepted communications to facilitate the creation of highly detailed identity profiles on Plaintiffs and Class members, which were then used and disseminated as described herein.

144. Because the Tracking Technologies intentionally and knowingly intercepted and disclosed, and Defendant intentionally and knowingly used Plaintiffs' and Class members' communications for the purpose of committing these criminal and tortious acts, it is not shielded by the "party exception" under the ECPA.

145. Plaintiffs and the Class suffered harm as a result of Defendant's violations of the ECPA, including the transmission of their sensitive data to a foreign adversary, and therefore seek (a) preliminary, equitable, and declaratory relief as may be appropriate, (b) the sum of the actual damages suffered and disgorgement of profits obtained by Defendant as a result of its unlawful conduct, or statutory damages as authorized by 18 U.S.C. § 2520(c)(2), whichever is greater, (c)

-23-

punitive damages, and (d) reasonable costs and attorneys' fees.

146. Plaintiffs, individually and on behalf of the members of the Nationwide Classes, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 631, *et seq.*
### (*On Behalf of Plaintiffs & the Class or, alternatively, the California Class*)

147. Plaintiffs and the Class members incorporate the foregoing allegations as if fully set forth herein.

148. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.

149. The Act begins with its statement of purpose: "The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping on private communications and the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

150. California Penal Code § 631(a) provides in relevant part:

> any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

151. A defendant must show it had the consent of all parties to the communication.

152. At all relevant times, Defendant aided, agreed with, and conspired with third parties

-24-

to track and intercept Plaintiffs' and the Class members' internet communications exchanged with Defendant while accessing Defendant's website. Defendant assisted these interceptions without the requisite consent from Plaintiffs and the Class members.

153. The Tracking Technologies intercepted these communications without consent from all parties to the communications.

154. The Tracking Technologies intended to learn, and did learn, some meaning of the content in the communications including without limitation in the URLs, search queries, and other content described herein exchanged between the Class members and Defendant on Defendant's Websites.

155. Defendant, when aiding and assisting Tracking Technologies' eavesdropping, intended those third parties to learn the content of the visitor's communications.

156. Defendant used, or attempted to use, information so obtained or, in the alternative, aided and assisted Anker in using or attempting to use, information so obtained.

157. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and, even if they do not, the tracking technology provided by the third parties falls within the broad catch-all category of "any other manner":

a. The computer codes and programs that the Tracking Technologies used to track Plaintiffs' and the Class members' communications while they navigated the Websites;

b. Plaintiffs' and Class members' browsers;

c. Plaintiffs' and Class member's computing and mobile devices;

d. The web and ad servers of the Tracking Technologies;

e. The computer codes and programs that the Tracking Technologies used to track and intercept the Plaintiffs' and Class members' communications while they were using a browser to visit Defendant's Websites.

158. The tracking and interception of Plaintiffs' and Class members' communications while they were using a web browser or mobile application to visit Defendant's Websites originated in and was executed in California.

159. Pursuant to California Penal Code § 637.2, Plaintiffs and the Class members have

-25-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

been injured by the violation of California Penal Code § 631 and each seek damages for the greater of $5,000 or three times the actual amount of damages, as well as injunctive relief.

## THIRD CAUSE OF ACTION

### CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 632, *et seq.*
### *(On Behalf of Plaintiffs & the Class or, alternatively, the California Class)*

160.    Plaintiffs and the Class members incorporate the foregoing allegations as if fully set forth herein.

161.    California Penal Code Section 632(a) provides that:

[E]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]

162.    The data collected on Defendant's Websites constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of privacy in the circumstances.

163.    Defendant intentionally used an electronic recording device—specifically, the tracking technology embedded within the Websites—to eavesdrop upon and record these confidential communications.

164.    This technology constitutes an "electronic amplifying or recording device" within the meaning of Section 632(a) because it is specifically designed to capture, record, and transmit user interactions and communications in real-time for analytics and behavioral tracking purposes.

165.    Defendant intentionally implemented and activated this recording technology within its Websites with full knowledge that it would capture and record users' confidential communications.

166.    Defendant's recording of Plaintiffs' and Class members' confidential communications was accomplished without the requisite consent.

167.    Defendant's conduct was undertaken intentionally and with knowledge that the

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Tracking Technologies would record confidential communications without the requisite consent.

168. The confidential communications that were unlawfully recorded include protected information that individuals provided with reasonable expectations of confidentiality.

169. Defendant is directly liable under section 632. Alternatively, Defendant is liable for aiding in violations of section 632 by the Tracking Technologies and/or Anker.

170. As a direct and proximate result of Defendant's violations of Section 632, Plaintiffs and the Class members have suffered harm including invasion of their privacy rights, violation of confidentiality and protection by the BSDR, and loss of control over their sensitive information.

171. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations. Plaintiffs and Class members have a reasonable fear that their confidential communications will continue to be unlawfully recorded if they use the Websites.

172. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class members have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## FOURTH CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 638.51(A)
### (On Behalf of Plaintiffs & the Class or, alternatively, the California Class)

173. Plaintiffs and the Class members incorporate the foregoing allegations as if fully set forth herein.

174. Plaintiff brings this claim in the alternative to, or in addition to, violations of Cal. Penal Code sections 631(a) and 632, which prohibit the interception of the contents of communications in transit. The section 638.51(a) claim is based solely on Defendant's capture of non-content signaling data, regardless of whether content was also intercepted. The Tracking Technologies are able to capture content, or not, because they work by loading a small library of functions which can be used whenever a site visitor takes an action tracked.

175. CIPA is codified at California Penal Code sections 630–638. The Act begins with its statement of purpose in California Penal Code section 630:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping

-27-

upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

176. CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

177. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

178. A "trap and trace device" is " a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

179. The Tracking Technologies are "pen registers" or "trap and trace devices" because they are "device[s] or process[es]" that "record[ed]" or "capture[d]" the "routing, addressing, or signaling information"—the identifiers discussed above—from the electronic communications transmitted by Plaintiffs' and the Class members' computers, tablets or smartphones. Cal. Penal Code § 638.50.

180. Likewise, the Tracking Technologies are "pen registers" or "trap and trace devices" because they are "device[s] or process[es]" that "capture[d]" the unique user identifiers from the electronic communications transmitted by Plaintiffs' and the Class Members' computers, tablets or smartphones. Cal. Penal Code § 638.50.

181. The unique IDs are "addressing" information because they are used to tie Websites user to third parties' databases and repositories of information about the user and ascertain the user's identity.

182. At all relevant times, Defendant installed the Tracking Technologies—which include pen registers or trap and trace devices—on Plaintiffs' and Class members' browsers and used the Tracking Technologies to collect Plaintiffs' and Class Members' identifiers.

-28-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

183. The Tracking Technologies collect Plaintiffs' and Class Members' identifiers independent of the contents it also collects of Plaintiffs' and the Class Members' electronic communications with Defendant.

184. Plaintiffs and Class members did not provide their prior consent to Defendant's use of the Tracking Technologies to collect their identifiers.

185. Defendant did not obtain a court order to install or use the Tracking Technologies.

186. Defendant, in its conduct alleged here, was not providing an "electronic communication service" as that term is defined in 18 United States Code section 2510(12) and used in the Wiretap Act. Defendant was not acting as an Internet Service Provider.

187. Even if Defendant did qualify as an "electronic communication service" provider, (i) it did not install or use pen registers and/or trap and trace devices solely for the purpose of operating or protecting its own service, but instead used them for analytics, marketing, behavioral profiling, or unauthorized surveillance; and (ii) its deployment of pen registers and/or trap and trace devices in this context exceeds the narrow technical exception set forth in § 638.51(b), as it permitted third parties (e.g., data analytics or tracking vendors) to receive, process, or store these intercepted signals without user consent or judicial oversight.

188. Defendant's use of the Tracking Technologies to act as pen registers and/or trap and trace devices for the purpose of creating, and aiding third parties to create, valuable behavioral and advertising profiles about Plaintiff and Class members' without their consent constitutes a redressable concrete harm.

189. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and the Class members have been injured by the violations of Cal. Penal Code § 638.51, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

### FIFTH CAUSE OF ACTION

**UNJUST ENRICHMENT**
***(On Behalf of Plaintiffs & the Class)***

190. Plaintiffs and the Class members incorporate the foregoing allegations as if fully set forth herein.

-29-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

191. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members through its unauthorized collection, use, and monetization of their personal data.

192. Plaintiffs and Class members conferred benefit upon Defendant by providing valuable information through their use of the Websites.

193. Such sensitive information commands exceptional value due to its predictive power and marketing utility.

194. Defendant received and retained this benefit by intercepting, collecting, and transmitting Plaintiffs' and Class members' sensitive to the Tracking Technologies and Anker through embedded technology without authorization or consent.

195. Defendant has been unjustly enriched through several mechanisms:

a. **Data Monetization:** Defendant derives commercial value from sharing users' information with third parties for marketing analytics, behavioral targeting, and user profiling purposes;

b. **Cost Avoidance:** Defendant avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to this valuable data;

c. **Competitive Advantage:** Defendant gained unfair competitive advantages by leveraging detailed data profiles to optimize its platform and marketing without bearing the costs associated with compliant data collection.

d. **Enhanced Platform Value:** The unauthorized collection of comprehensive user data increases the overall value and effectiveness of Defendant's platform, and the PRC's surveillance apparatus.

196. Defendant obtained this benefit through unlawful interception and unauthorized disclosure of information in violation of the BSDR, ECPA, Cal. Penal Code §§ 631-632, and/or the CDAFA.

197. Whereas Plaintiffs and Class members provided this valuable information with a reasonable expectation of privacy and BSDR compliance, Defendant actively concealed its data collection and sharing practices from users who were unaware their sensitive information was being

-30-

intercepted and monetized.

198.    Defendant's retention of these benefits violates fundamental principles of fairness and equity, as Defendant has profited from the unauthorized exploitation of sensitive and valuable personal information without providing any compensation or benefit to the individuals whose privacy was violated.

199.    Plaintiffs and Class members have no adequate remedy at law for Defendant's Unjust Enrichment, as they cannot recover the specific value of their appropriated data through traditional damages calculations.

200.    As a direct and proximate result of Defendant's Unjust Enrichment, Plaintiffs and Class members are entitled to restitution and disgorgement of all benefits, profits, and value that Defendant has obtained through the unauthorized collection and use of their protected information.

201.    Plaintiffs and Class members seek judgment requiring Defendant to disgorge all profits, benefits, and value obtained through its unlawful conduct, together with interest thereon, and such other relief as the Court deems just and proper.

## SIXTH CAUSE OF ACTION

### INVASION OF PRIVACY
### (*On Behalf of Plaintiffs & the California Class*)

202.    Plaintiffs and the California Class members incorporate the foregoing allegations as if fully set forth herein.

203.    The right to privacy in California's constitution creates a right of action against private entities such as Defendant.

204.    Plaintiffs' and class members' expectation of privacy is deeply enshrined in California's Constitution.

205.    Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among those are enjoying and defending life and liberty, acquiring, possessing, and protecting property and obtaining safety, happiness, and private."

206.    The phrase "and privacy" was added in 1972 after voters approved a proposed

-31-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

legislative constitutional amendment designated as Proposition 11.

207. Critically, the argument in favor of Proposition 11 reveals the legislative intent was to curb business' control over unauthorized collection and use of consumers' personal information:

> The right of privacy is the right to be left alone ... It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.

208. The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendant.

209. Plaintiffs and the class members have a legally protected interest in preventing the unauthorized collection, aggregation, and dissemination of their personal information, particularly when this data reflects sensitive aspects of their personal lives.

210. Plaintiffs and the class also have a strong interest in preventing the widespread distribution of detailed behavioral profiles to unknown third parties—including foreign entities—without their knowledge or consent.

211. Plaintiffs and the California Class maintain a reasonable expectation of privacy in their day-to-day lives, including in their Internet browsing activity, online communications, and the personal data that Defendant surreptitiously collects, enriches, and shared with countries of concern without the knowledge or consent of Plaintiffs and the California Class members.

212. Defendant invades these interests, in violation of Plaintiffs' and the California Class members' reasonable expectation of privacy through its covert collection, aggregation, correlation, and dissemination of sensitive information and persistent identifiers tied to Plaintiffs and the California Class members as alleged herein.

213. Defendant intentionally and extensively violates the reasonable expectation of privacy held by Plaintiffs and the California Class members through engaging in this covert, large-scale data collection, designed to uniquely identify and surveil individuals.

214. This extensive covert surveillance and targeting would be highly offensive to a reasonable person and constitutes an egregious breach of social norms.

-32-

215.    Defendant stockpiles a vast range of personal information, including persistent identifiers (e.g., cookie IDs, device IDs, mobile advertising IDs, and IP addresses), device metadata (e.g., screen resolution, browser version, operating system, and language settings), and contextual information such as full URLs and referring pages. This contextual data often reveals the exact content being viewed by the individual.

216.    This widespread surveillance and distribution of personal data occurs without meaningful disclosure or the requisite consent and defies users' reasonable expectations of privacy. No reasonable user would expect that Fantasia would collect and distribute sensitive information to countries of concern.

217.    Secretly collecting such data in sensitive contexts is highly offensive. Correlating that information into detailed user profiles is highly offensive. Sharing those profiles with a foreign adversary is highly offensive.

218.    As described above, the U.S. government has identified China and its control of personal data as adversarial to national security and the safety of U.S. citizens.

219.    Americans have a strong interest in protecting their personal data from an entity the U.S. government has identified as a threat to national security and the safety of U.S. citizens.

220.    Despite the dangers of sharing this sensitive data with a company subject to Chinese control, Fantasia knowingly shares sensitive information with Anker.

221.    These actions represent egregious breaches of social norms and violate both the reasonable expectation of privacy held by Plaintiffs and the California Class members, and the constitutional right to privacy guaranteed under California law.

222.    In short, committing criminal and tortious acts against millions of Americans constitutes an egregious breach of social norms that is highly offensive.

223.    As a result of these extensive and intentional invasions of privacy, Plaintiffs and the California Class members have suffered harm and are entitled to compensation and injunctive relief.

//

//

-33-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

# SEVENTH CAUSE OF ACTION

## INTRUSION UPON SECLUSION UNDER CALIFORNIA COMMON LAW
### (*On behalf of Plaintiffs & the California Class*)

224.    Plaintiffs and the California Class members incorporate the foregoing allegations as if fully set forth herein.

225.    Plaintiffs and the California Class members have a strong interest in preventing the unauthorized collection, aggregation, and dissemination of their personal information.

226.    These individuals maintain a reasonable expectation of privacy in their day-to-day lives—an expectation that extends not only to their Internet browsing activity and online communications, but also to the personal data that Fantasia surreptitiously collects, enriches, de-anonymizes, and shares with covered persons without the knowledge or consent of Plaintiffs and the California Class members.

227.    Fantasia has violated Plaintiffs' and the California Class members' reasonable expectation of privacy through its collection, aggregation, correlation, and dissemination of Plaintiffs' and the California Class members' personal information.

228.    Fantasia's practices are highly offensive to a reasonable person and constitute an egregious breach of social norms.

229.    Fantasia intentionally and extensively violates the reasonable expectation of privacy held by Plaintiffs and the California Class members through engaging in covert, large-scale data collection designed to uniquely identify and surveil U.S. individuals.

230.    Fantasia uses tools that secretly harvest and correlate personal information, enriches that data with additional details, and builds highly detailed identity profiles unique to each individual.

231.    These profiles are then shared with Anker and other covered persons.

232.    Collecting detailed information about a person's device, behavior, or website usage is inherently intrusive.

233.    Most people would be shocked to learn that simply opening the Websites could trigger data harvesting and the silent creation of a detailed behavioral profile tied to their identity.

-34-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

234. This covert surveillance, subsequent profiling, and onward sharing with foreign adversaries, would be highly offensive to a reasonable person and constitutes a profound violation of social norms.

235. Fantasia, through the Tracking Technologies, does not merely collect isolated data points from Plaintiffs and California Class members. It stockpiles a vast range of personal information, including persistent identifiers (e.g., cookie IDs, device IDs, mobile advertising IDs, and IP addresses), device metadata (e.g., screen resolution, browser version, operating system, and language settings), and contextual information such as full URLs and referring pages. This contextual data often reveals the exact content being viewed by the individual.

236. Through these practices, Fantasia aids the interception, tracks, collects, aggregates, uses, and redistributes the Internet activity and communications of Plaintiffs and Class members.

237. Fantasia's extensive use of identifying cookies further enable the linkage of user identifiers across sessions, allowing Fantasia to build a detailed, persistent profile on each individual.

238. Correlating this data into rich behavioral profiles, then attaching persistent identifiers that allow parties to link the behavior to real-world identities is also highly offensive to a reasonable person. Moreover, sharing those profiles with foreign adversaries, without the user's knowledge or meaningful consent, is highly offensive behavior.

239. As described above, the U.S. government has identified China and its control of personal data as adversarial to national security and the safety of U.S. citizens. Americans have a strong interest in protecting their personal data from an entity the U.S. government has identified as a threat to national security and the safety of U.S. citizens.

240. Despite the dangers of sharing this sensitive data with a company subject to Chinese control, Fantasia knowingly shares sensitive information—including browsing activity, behavioral insights, and personal identifiers—with countries of concern.

241. The extent of Fantasia's collection, enrichment, and redistribution of highly detailed identity profiles is staggering and highly offensive.

242. These actions represent egregious breaches of social norms and violate the

-35-

reasonable expectation of privacy held by Plaintiffs and the California Class members.

243. Fantasia lacks any legitimate business interest in covertly tracking, profiling, and aggregating the identities and private information of Plaintiffs and the California Class members.

244. As a result of these extensive and intentional invasions of privacy, Plaintiffs and the California Class members have suffered harm and are entitled to just compensation and injunctive relief.

## EIGHTH CAUSE OF ACTION

**VIOLATION OF THE COMPREHENSIVE COMPUTER DATA AND ACCESS AND FRAUD ACT**
**Cal. Penal Code § 502, *et seq.***
**(*On Behalf of Plaintiffs & the Class or, alternatively, the California Class*)**

245. Plaintiffs and the Class members incorporate the foregoing allegations as if fully set forth herein.

246. California's Comprehensive Data and Access and Fraud Act ("CDAFA") provides: "For purposes of bringing a civil or a criminal action, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Cal. Pen. Code § 502.

247. Defendant violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiffs' and the California Class members' data.

248. Defendant effectively charged Plaintiffs and the Class members by taking, copying, analyzing, and using their valuable personal information without permission and exploiting that information for Defendant's own financial benefit.

249. Plaintiffs and the Class members retain a stake in the profits Defendant earned from their personal information and other data because, under the circumstances, it is unjust for Defendant to retain those profits.

250. As a direct and proximate result of Defendant's unlawful conduct within the meaning of Cal. Penal Code § 502, Defendant has caused loss to Plaintiffs and the Class members and has been unjustly enriched in an amount to be proven at trial.

-36-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

251.   Plaintiffs, on behalf of himself and the Class members, seek compensatory damages and/or disgorgement in an amount to be proven at trial, and declaratory, injunctive, or other equitable relief.

252.   Plaintiffs and the Class members are entitled to punitive damages because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice.

253.   Plaintiffs and the Class members are also entitled to recover their reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

### NINTH CAUSE OF ACTION

**CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(*On behalf of Plaintiffs & the California Purchaser Class*)**

254.   Plaintiffs and the California Purchaser Class members incorporate the foregoing allegations as if fully set forth herein.

255.   California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

256.   Defendant's "unlawful" acts and practices include its violation of the Wiretap Act, 18 U.S.C. § 2510, *et seq.*; the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632; the California Computer Data Access and Fraud Act, Cal. Penal Code § 502, *et seq.*; the BSDR; Intrusion upon Seclusion, and Invasion of Privacy.

257.   Defendant's conduct violated the spirit and letter of those laws, which protect property, economic and privacy interest and prohibits unauthorized disclosure of private communications and personal information.

258.   Defendant's "unfair" acts and practices include its violation of property, economic and privacy interests protected by the statutes identified above.

259.   To establish liability under the unfair prong, Plaintiffs and California Purchaser Class members need not establish that these statutes were actually violated, although the claims pleaded herein do so.

-37-

260.    Plaintiffs and California Purchaser Class members have suffered injury-in-fact, including the loss of money and/or property as a result of Defendant's unfair and/or unlawful practices because they would not have used the Websites or made purchases thereon, if they had known that their privacy would not be respected.

261.    Defendant's actions caused damage to and loss of Plaintiffs and the California Purchaser Class members because they would not have purchased from the Websites if they had known that Defendant would not respect their privacy rights.

262.    Defendant reaped unjust profits and revenue in violation of the UCL. This includes Defendant's profits and revenues from Plaintiffs and California Purchaser Class members' personal information and communications. Plaintiffs and the California Purchaser Class members seek restitution and disgorgement of these unjust profits and revenues.

## TENTH CAUSE OF ACTION

### VIOLATION OF CONSUMER LEGAL REMEDIES ACT, Cal. Civ. Code § 1750, *et seq.*
### (*On behalf of Plaintiffs & the California Purchaser Class*)

263.    Plaintiffs and the California Purchaser Class members incorporate the foregoing allegations as if fully set forth herein.

264.    The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices…undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

265.    Defendant is a "person" within the meaning of the CLRA. *See* Cal. Civ. Code § 1761(c).

266.    Plaintiffs and the California Purchaser Class members are "consumers" within the meaning of the CLRA because they purchased Defendant's goods and services for personal, family, or household purposes. *See* Cal. Civ. Code § 1761(d).

267.    Defendant's sale of products and services to Plaintiffs and the California Purchaser Class members is an "agreement between a consumer and another person" and is therefore a "transaction" within the meaning of the CLRA. *See* Cal. Civ. Code §§ 1761(e).

268.    In connection with the sale of its products and services to Plaintiffs and the

-38-

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

California Purchaser Class members, Defendant engaged in unfair and deceptive acts and practices in violation of California Civil Code § 1770(a), including the following:

a.      Representing that goods have characteristics, uses, or benefits which they do not have, in violation of § 1770(a)(5): Defendant failed to acknowledge that its Tracking Technologies surreptitiously intercept users' personal data so that Defendant can transmit them to covered persons in violation of the BSDR.

b.      Representing that goods are of a particular standard, quality, or grade when they are not (Cal. Civ. Code § 1770(a)(7)): Defendant represented that its products meet a standard of privacy of security, that they do not meet.

c.      Advertising goods with intent not to sell them as advertised (Cal. Civ. Code §§ 1770(a)(9)): Defendant advertised its products and Websites protect the privacy and confidentiality of personal information, while intending at all times to deploy the Tracking Technologies on the Websites to intercept, collect, and transmit consumers' personal data to third parties and to entities affiliated with China, in violation of the BSDR and applicable privacy laws.

d.      Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve (Cal. Civ. Code § 1770(a)(14)): Defendant's representations to consumers failed to disclose: (i) the specific Tracking Technologies deployed and the identity of each third-party recipient; (ii) that user data is transmitted to entities subject to the jurisdictional control of China; and (iii) that Defendant's and Anker's Chinese affiliations subject consumers' data to compelled disclosure under PRC national intelligence laws.

e.      Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal Civ. Code § 1770(a)(16)): Defendant failed to disclose: (i) the specific Tracking Technologies deployed and the identity of each third-party recipient; (ii) that user data is transmitted to entities subject to the jurisdictional control of China; and (iii) that

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Defendant's and the Anker's Chinese affiliations subject consumers' data to compelled disclosure under PRC national intelligence laws.

269. Defendant's misrepresentations and omissions were material because a reasonable consumer would consider them important in deciding whether to purchase Defendant's products or services. Had Plaintiffs and the California Purchaser Class members known the truth—that Defendant's operations are deeply entangled with the Chinese government and that their personal data would be surreptitiously collected and transmitted to entities subject to PRC intelligence-access obligations—they would not have purchased Defendant's products, or would have paid substantially less for them.

270. Plaintiffs and the California Purchaser Class members relied on Defendant's misrepresentations and omissions in deciding to purchase Defendant's products. Defendant's misrepresentations and omissions were made in marketing materials, the Website, and in Defendant's Privacy Policy and related policies, all of which were designed to, and did, induce consumers to purchase Defendant's products.

271. As a direct and proximate result of Defendant's violations of the CLRA, Plaintiffs and the California Purchaser Class members have suffered injury-in-fact, including (i) the loss of money paid to purchase Defendant's products they would not otherwise have purchased, or would have purchased at a lower price, had they known the truth; (ii) the diminution in value of products that do not possess the privacy, and security characteristics that were represented; and (iii) the loss of valuable personal data that was surreptitiously collected and transmitted to third parties and to entities affiliated with a foreign adversary.

272. Plaintiffs, individually and on behalf of the California Purchaser Class members, have complied with California Civil Code § 1782 by providing Defendant with notice and a demand for corrective action.

273. Pursuant to California Civil Code §§ 1780 and 1782, Plaintiffs, on behalf of themselves and the California Purchaser Class members, seek: an order enjoining Defendant from continuing to engage in the unfair and deceptive acts and practices alleged herein, including an order requiring Defendant to: (i) cease misrepresenting or omitting its Chinese affiliations and the

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

privacy and security deficiencies of its Website; (ii) cease the surreptitious interception, collection, and transmission of consumers' personal data to entities affiliated with countries of concern under the BSDR; and (iii) implement truthful and adequate disclosures identifying the third-party recipients of user data, the scope of data collected, and the fact that user data flows to entities subject to PRC intelligence-access obligations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that this Court enter judgment against Defendant Fantasia and in favor of Plaintiffs and the Classes, and grant the following relief:

   a.   For an order certifying the Classes and naming Plaintiffs as the representatives of the putative Classes and Plaintiffs' attorneys as Class Counsel to represent the putative Class members;

   b.   For an order declaring that the Defendant's conduct violates the statutes and laws referenced herein;

   c.   For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

   d.   For statutory damages in amounts to be determined by the Court and/or jury;

   e.   For prejudgment interest on all amounts awarded;

   f.   For injunctive relief, restitution, and disgorgement, as pleaded or as the Court may deem proper; and

   g.   For an order awarding Plaintiffs and the putative Classes their reasonable attorneys' fees and expenses and cost of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury for all issues so triable.

Dated: March 4, 2026

Respectfully submitted,

By:  */s/ Victor J. Sandoval*
Victor J. Sandoval, SBN 344461
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd Ste 1121,
Los Angeles, CA 90034
(562) 534-5907
victor@almeidalawgroup.com

David S. Almeida (*pro hac vice* forthcoming)
849 W. Webster Avenue

-41-

Chicago, Illinois 60614
(708) 437-6476
david@almeidalawgroup.com

*Counsel for Plaintiffs & the Proposed Classes*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL